**JACOBSON LAW FIRM**
6367 E. TANQUE VERDE RD., SUITE 204
TUCSON, ARIZONA 85715
TELEPHONE (520) 885-2518
FACSIMILE (520) 885-8073
jeff@jacobsonlawfirm.net
Jeffrey H. Jacobson, PCC #65402; SB#019502
Attorney for Petitioner

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ROBERT BRADFORD, JR.,<br><br>                          Petitioner,<br><br>vs.<br><br>UNION PACIFIC RAILROAD<br>COMPANY, a Delaware corporation,<br><br>                          Respondent. | No.<br><br>**PETITION FOR JUDICIAL REVIEW OF ADMINISTRATIVE DECISION PURSUANT TO RAILWAY LABOR ACT, 45 U.S.C. § 151 et seq.**<br><br>(Re:  Public Law Board No. 6712 Award No. 146) |

Petitioner Robert Bradford, Jr., through undersigned counsel, hereby petitions this Court to review and set aside Award No. 146 of Public Law Board No. 6712.  Judicial review of the Award is requested on the grounds and for the reasons that, during the formal investigation and at the subsequent hearing before the Board, Petitioner was denied his fundamental right to due process of law as established in the Collective Bargaining Agreement between Union Pacific Railroad Company and the United Transportation Union, for the Board's failure to confine itself to matters within the scope of its jurisdiction, and for the Board's failure to comply with the requirements of the Railway Labor Act, 45 U.S.C. § 151 et seq.

### PARTIES, JURISDICTION AND VENUE

1.     Petitioner Robert Bradford, Jr. (Petitioner) is a resident of Pima County, Arizona.

2.     Union Pacific Railroad Company (Union Pacific) is a corporation organized and existing under the laws of the State of Delaware.  Its principal place of business is in

Omaha, Nebraska. Union Pacific operates throughout the western United States, including the State of Arizona. Union Pacific is a carrier within the meaning of and subject to regulation under the Railway Labor Act (RLA).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

4.      Petitioner has been employed by Union Pacific (and its predecessor company Southern Pacific Railroad) for 28 years, beginning his employment as a brakeman on June 15, 1979.  He established seniority rights as a conductor in 1981[1] and worked in that capacity until his termination in 2007.

5.      During his employment with Union Pacific, Petitioner was a member in good standing of the United Transportation Union (Union).

6.      Petitioner's employment with Union Pacific was governed by the Collective Bargaining Agreement (CBA) between Union Pacific and the Union.   Petitioner was entitled to the benefits and privileges of the CBA.

7.      This action arises under the RLA and is brought for judicial review of an award issued by Public Law Board No. 6712.  This Court has jurisdiction pursuant to Section 3 of the RLA, as amended (45 U.S.C. § 153(q)).

8.      On December 16, 2008, the Board issued Award No. 146 (Award). Exhibit A.

9.      Petitioner is seeking judicial review of the PLB's Award based on deprivation of Petitioner's contractual and constitutional rights to due process.

---

[1] Union Pacific purchased Southern Pacific Railroad in 1996.  At that time, the Union representing Southern Pacific workers negotiated a contract with Union Pacific where existing Southern Pacific employees would be offered a guaranteed salary as long as they agreed to stay "marked up", meaning available to be called to work and would not lay off upon being called to duty.  The guaranteed salary was determined by conducting a Test Period Average (TPA).  The TPA was an average of the last 12 months of the employee's salary.   The TPA became the employee's guaranteed salary until retirement.   Upon information and belief, Union Pacific has not entered into any contracts since 1996 that include a TPA-guarantee.  Put another way, no employee hired after 1996 has a TPA-guaranteed salary.  Through attrition, retirement, separation, and other factors, Petitioner is the youngest person in Tucson with Union Pacific to be collecting a TPA-guaranteed salary. As a result, Union Pacific has to pay Petitioner's TPA guarantee for a longer period of time than it does for any of its other employees.

2

## GENERAL ALLEGATIONS

**The Railway Labor Act (RLA)**

10.     The RLA is part of a special statutory system that regulates labor-management relations in the railroad industry.

11.     The RLA establishes elaborate administrative procedures for the resolution of labor disputes

12.     The RLA has, as its objective, the peaceful resolution of disputes between the parties by requiring both sides to meet and make complete, open and honest disclosures of their positions in an effort to reach an agreement.

13.     The procedure for challenging disciplinary charges arising from a positive drug test is created by the CBA in accordance with the RLA.  If not settled through the railroad's internal dispute resolution process, the dispute may be submitted to an arbitration board chosen by the parties known as the Public Law Board (PLB).  This process replaces compulsory arbitration before the National Railroad Adjustment Board.  45 U.S.C. § 153.

14.     The course of the disciplinary proceedings is under the control and direction of Union Pacific and is conducted by it.  Throughout the grievance process, employees have both contractual and Constitutional due process rights.

15.     The grievance procedure beings with an investigation that takes place on railroad property, known as an on-property investigation hearing.

16.     The purpose of the on-property investigation hearing is to develop all the facts material to the charges, both favorable to and against the employee, not for the purpose of proving the correctness of the charges.

17.     The parties cannot comply with the requirements of the RLA without disclosing all of the specific information each side intends to rely on.

**The Collective Bargaining Agreement (CBA)**

18.     The CBA between Union Pacific and the Union establishes, among other things, the procedural rights that pertain to on-property investigation hearings.  Appendix A-1.

19.     Pursuant to the CBA, as well as Board precedent, Petitioner was entitled to due process during the on-property investigation hearing, including the opportunity to be heard and to present evidence on his behalf.

20.     The procedures for disciplining employees are outlined in the Memorandum of Understanding between Union Pacific and the Union (Discipline Agreement).  Appendix B.

21.     The Discipline Agreement revises and replaces the CBA's discipline provisions, Articles 57 (Appendix A-2) and 58 (Appendix A-3) of the CBA.

22.     Article II(A) of the Discipline Agreement states, in part, that "Employees will not be disciplined without just and sufficient cause as determined by a fair and impartial investigation . . . ."  Appendix B, p. 1.

23.     Article V(E) of the Discipline Agreement provides that "[w]hen request is made sufficiently in advance the employee and/or the [Union's] Local Chairperson . . . will be allowed to examine material or exhibits to be presented in evidence prior to the investigation." Appendix B, p. 3.

24.     Article V(E) further states that, "[a]t the investigation, the employee and/or the [Union's] Local Chairperson . . . will be afforded the opportunity to examine or cross-examine all witnesses."  *Id.*

25.     The CBA guarantees that Union Pacific will deal impartially with the employee in accordance with the commonly accepted standards of fairness.  See PLB No. 5942, Award No. 43.  Appendix C-1.

26.     At the on-property investigation hearing, all evidence in the case should be submitted to insure a complete and fair investigation to determine whether discipline is warranted.

27.     All employees whose testimony may be necessary to develop all of the essential facts should be present for the on-property investigation hearing.

**The Medical Review Officer (MRO)**

28.     The MRO works for Union Pacific and verifies the results of drug and alcohol tests.

4

29.    Once an employee asserts that the presence of a drug or drug metabolite in his or her specimen results from taking prescription medication, the MRO must review and take all reasonable and necessary steps to verify the authenticity of all medical records the employee provides.  49 C.F.R. §40.141.  Appendix D-1.

30.    Federal Regulations and Union Pacific's internal Drug and Alcohol Policy direct the MRO to evaluate information that casts doubt on a positive drug test.  49 C.F.R § 40.33; 49 CFR § 219.707.  Appendix D-2 and D-3.

31.    Within ten (10) days of an employee's written request, the MRO is required to provide the employee with copies of any records pertaining to his use of alcohol and/or drugs, and all records relating to the results of the drug tests.  49 C.F.R. § 40.329, 49 C.F.R. § 40.11.  Appendix D-4 and D-5.

32.    Union Pacific is responsible for insuring that the MRO complies with his obligation to provide Petitioner with the records pertaining to the employee's use of alcohol and/or drugs, including records of the employee's DOT-mandated drug and/or alcohol tests. 49 C.F.R. §40.11 (Appendix D-5) provides, in pertinent part:

(a)  As an employer, you are responsible for meeting all applicable requirements and procedures of this part;

(b)  You are responsible for all actions of your officials, representatives, and agents (including service agents) in carrying out the requirements of the DOT agency regulations;

(c)  All agreements and arrangements, written or unwritten, between and among employers and service agents concerning the implementation of DOT drug and alcohol testing requirements are deemed, as a matter of law, to require compliance with all applicable provisions of this part and DOT agency drug and alcohol testing regulations.   Compliance with these provisions is a material term of all such agreements and arrangements."

33.    Pursuant to 49 C.F.R. §40.171 (Appendix D-6), the employee must make a timely request for a split-sample test:

(a) As an employee, when the Medical Review Officer has notified you that you have a verified positive drug test or refusal to test because of adulteration or substitution, you have 72 hours from the time of notification to request a test of the split specimen. The request may be verbal or in writing. If you

5

make this request to the MRO within 72 hours, you trigger the requirements of this section for a test of the split specimen and . . .

(c) When the employee makes a timely request for a test of the split specimen under paragraphs (a) and (b) of this section, you must, as the Medical Review Officer, immediately provide written notice to the laboratory that tested the primary specimen, directing the laboratory to forward the split specimen to a second HHS-certified laboratory. You must also document the date and time of the employee's request."

34.    Union Pacific was also responsible for making sure that the MRO complied with Petitioner's timely request to test a split-sample. 49 C.R.F. § 40.173(a).  Appendix D-7.

**The On-Property Investigation Hearing Officer**

35.    A Union Pacific hearing officer presides over the on-property investigation hearing.

36.    Union Pacific's hearing officer has an affirmative obligation to develop all of the material facts.

37.    Hearing officers need not follow technical rules of procedure and evidence, but they must conduct the hearing in such a manner as to show impartiality with no predisposition against the Claimant.

38.    The hearing officer is obligated to seek out all the facts surrounding the incident in question, those which favor as well as those which militate against the accused.

39.    The hearing officer must impartially gather all of the evidence in the case before rendering a decision.  Failure to do so deprives the employee of a fair and impartial hearing.

40.    Impartiality demands that a hearing officer maintain a neutral role in developing all the facts at the trial pertaining to the offense with which an employee is charged.  See Award No. 2158 (NRAB, Div. 4); Public Law Board No. 3863, Award No. 1; Public Law Board No. 4093, Award No. 16 and Public Law Board No. 2774, Award No. 146.  Appendix D-2 through D-5.

//

6

**The Public Law Board (PLB)**

41.     The PLB's jurisdiction in disciplinary cases is limited to reviewing the record made at the on-property hearing to determine whether:  (1) the employee charged was afforded due process; (2) the carrier's finding of guilt was supported by substantial and relevant evidence of probative value--the carrier has the burden of proof; and (3) the discipline imposed was reasonable.

42.     The jurisdiction of the PLB in disciplinary cases is limited to reviewing the record made at the investigative hearing to determine whether the employee charged was afforded due process.

43.     All proceedings conducted by the arbitrator are to be in conformity with the contractual obligations of the parties.  PLB precedent requires that all procedural issues must be resolved before the PLB can reach a decision on the merits.  29 C.F.R. § 1404.14; see Award No. 4969 (NRAB, Div. 4); Award No. 2349 (NRAB, Div. 4).  Appendix D-8; Appendix C-6 and C-7.

### CHRONOLOGY OF EVENTS

44.     In 2006, after testing positive for drugs, Petitioner voluntarily participated in Union Pacific's Drug and Alcohol Rehabilitation / Education Program.

45.     On September 4, 2007, Petitioner was scheduled to work on a train traveling from Tucson to El Paso, Texas.  At 5:10 a.m., Petitioner was subjected to a Federal Railroad Administration (FRA) random follow-up drug and alcohol test.  Petitioner provided a urine sample (Sample) to a collection technician and completed his trip to El Paso.  Union Pacific later informed Petitioner that the test was positive for amphetamines.

46.     The technician that collected his sample did not follow proper procedures for ensuring the integrity and chain of custody of Petitioner's 5:10 a.m. test sample.

47.     Petitioner's Sample was split into two testable portions.

48.     Upon arrival in El Paso, Petitioner fell and hurt his tailbone.  As a result of the injury, at 3:51 p.m., at the discretion of the on-duty Union Pacific official, Petitioner was subjected to a 'for cause' drug and alcohol test.  This test was negative for amphetamines.

49.     At the time both tests were performed, Petitioner was taking prescribed medication for high blood pressure (Atenolol, Diovan and Hydrochlorothiazide).  Atenolol is a beta blocker, a class of drugs which studies have shown can cause a false-positive drug test result.

50.     On September 12, 2007, Petitioner was advised by Union Pacific's MRO that he had testified positive for amphetamines.  Petitioner denied using any drugs and informed the MRO that he was taking specific prescription medications.

51.     On or about September 13, 2007, Union Pacific mailed a Notice of Formal Investigation (Notice) charging Petitioner with violating Union Pacific Operating Rule 1.5 of the General Code of Operating Rules, Union Pacific Railroad Drug and Alcohol Policy (Drug and Alcohol Policy), as a result of the September 4, 2007, 5:10 a.m. drug test. Exhibit B.

52.     The Drug and Alcohol Policy, in part, prohibits the use or possession of over-the-counter or prescription drugs, narcotics, controlled substances, or medication that may adversely affect safe performance while on duty or on Company property, except medication that is permitted by a medical practitioner and is used as prescribed.  Appendix E.

53.     The Notice set a formal on-property investigation hearing for September 20, 2007, to develop the facts of the case.  The Notice provided that Petitioner would be allowed the opportunity to arrange for witnesses and representation by the Union's local chairperson or Union representative.  Exhibit B.

54.     On September 13, 2007, Petitioner faxed a request to the MRO asking for a split-sample test.  Exhibit C,  pp. 74-75.  The split-sample was not tested pursuant to Petitioner's request.

55.     On September 19, 2007, Petitioner submitted hair samples for testing by an independent toxicology lab.  The testing was conducted at an approved lab, and all procedures were followed in order to insure the integrity of the sample and the test results and to maintain the chain of custody.   These independent tests were negative for amphetamines for the preceding 90-120 days.  Exhibit D.

56.     The on-property investigation hearing scheduled for September 20, 2007 was rescheduled to October 24, 2007.

57.     On October 4, 2007, Petitioner again faxed the MRO asking for a split-sample test.  Exhibit E.  The split-sample was not tested pursuant to Petitioner's second request.

58.     On October 19, 2007, Petitioner submitted samples of his hair for a repeat independent toxicology test.   As with the test one month earlier, Petitioner used an approved lab.  All procedures were followed to insure the integrity of the sample and the test results, and to maintain a clear chain of custody.   This repeat toxicology test also showed that Petitioner had no amphetamines in his system during the preceding 90-120 days, including on September 4, 2007, when the initial drug test was performed.  Exhibit F.

59.     On October 24, 2007, Petitioner, his Union representative, and a representative from Union Pacific appeared before Hearing Officer Brian Crehan (HO Crehan) for the on-property investigation hearing.

60.     During the on-property investigation hearing, HO Crehan precluded Petitioner from introducing evidence in his defense, including the results of the independent hair sample toxicology tests.  HO Crehan also refused to allow Petitioner to present testimony from his expert witness, Mark Stoltman, a forensic toxicologist.

61.     The on-property investigation hearing concluded on November 30, 2007.

62.     On December 7, 2007, after reviewing the transcript of the investigation hearing, Union Pacific discharged Petitioner for violation of its Drug and Alcohol Policy.  Exhibit G.

63.     Petitioner appealed his dismissal and requested a hearing before the PLB.

64.     On September 11, 2008, after receiving written submissions from both parties, the PLB reviewed the decision of the on-property investigation hearing.

65.     The Agreement to Arbitrate between Union Pacific and the Union stipulates that, absent an agreement of the parties to extend the deadline, arbitration decisions shall be entered within 30 days of the hearing.  No agreement to extend the deadline was made.

66.     On December 16, 2008, 97 days after the hearing, the PLB entered its award denying Petitioner's appeal of his dismissal.   This Petition seeks Judicial Review of the PLB's award.

**The 5:10 a.m. September 4, 2007, Drug Test in Tucson**

67.     The threshold concentration for amphetamines in an initial drug test is 1000 nanograms per milliliter (ng/mL).

68.     According to the MRO, Petitioner tested positive for amphetamines at 711 ng/mL.

69.     On an initial drug test, a result below the cutoff concentration must be reported as negative.  49 C.F.R. §40.87.  Appendix D-9.  Therefore, the MRO should have reported the September 4, 2007, test result as negative, not positive.

70.     The MRO's September 12, 2007, report indicated that the initial test sample taken at 5:10 a.m. on September 4, 2007, in Tucson, arrived at the MRO's lab in Philadelphia, Pennsylvania, on the same day.

71.     The fact that a urine test sample was collected in Tucson in the morning, packaged and delivered to a shipping company, and arrived at a laboratory in Philadelphia, Pennsylvania the same day calls into question the validity of the test sample and, in fact, whether the alleged sample in Philadelphia belonged to someone other than Petitioner. Exhibit H.

**The 3:51 p.m. September 4, 2007, Drug Test in El Paso**

72.     Petitioner slipped and fell on his tailbone after arriving in El Paso.

73.     In his discretion, the on-duty Union Pacific official in El Paso decided to order a 'for cause' drug test.

74.     On September 4, 2007, less than 10 hours after his first drug test, Petitioner took another Union Pacific drug test at 3:51 p.m.

75.     The second drug test was negative for amphetamines.  Appendix F, p. 72.

**The On-Property Investigation Hearing**

76.     During the on-property investigation hearing, Petitioner challenged the authenticity of both the testing procedure and the test results.

77. HO Crehan prevented Petitioner from testifying at the on-property investigation hearing that the collection technician did not follow proper procedures and protocols for insuring the integrity and chain of custody of Petitioner's September 4, 2007, 5:10 a.m. sample.

78. During the on-property investigation hearing, HO Crehan participated in a private meeting with Union Pacific's Charging Officer Cagle and Penny Lyons, one of Union Pacific's officials in Omaha involved in overseeing contact with the MRO.  This meeting was conducted off the record and behind closed doors, thereby excluding Petitioner and the Union's Local Chairman from the discussion.  Appendix F, pp. 99-101.

79. Once the scientific accuracy or reliability of the test results was brought into question, Union Pacific failed to produce any corroboration that the documents in connection with the tests were handled in accordance with appropriate procedures.

80. At the on-property investigation hearing, Petitioner attempted to call his expert forensic toxicologist witness, Mark Stoltman (Expert Stoltman) to testify.  Appendix F, pp. 12-16.

81. HO Crehan, however, precluded Expert Stoltman because "Mr. Stoltman was not involved in the collection of, he didn't supervise the chain of custody of, and he did not observe the lab - certified lab that was making an examination of the specimen."  Appendix F, pp. 14-15.

82. Union Pacific's first witness was Safety Manager D.A. Cagle (Cagle). Despite the fact that Cagle was not involved in the collection of Petitioner's Sample, Cagle did not supervise the chain of custody of Petitioner's Sample, and Cagle did not observe the certified lab that examined the Sample, HO Crehan allowed Cagle's testimony as an expert on these subjects.  Appendix F, pp. 34-63.

83. Over Petitioner's objections, HO Crehan accepted Cagle's testimony that Union Pacific guidelines and policies were followed in collecting the Sample, that the chain of custody conditions were preserved, that the Sample was positive for amphetamines, and that Petitioner violated the Drug and Alcohol Policy.  Appendix F, p. 53.

84.     Despite the fact that the Notice of Formal Investigation indicated that Petitioner could present witnesses on his behalf, HO Crehan denied Petitioner the opportunity to present Expert Stoltman.

85.     Expert Stoltman would have testified that the original urinalysis taken by Union Pacific could not be relied upon and was invalid, and that the Petitioner could not have violated Union Pacific's drug and alcohol policy.

86.     Specifically, Expert Stoltman would have: 1) challenged the chain of custody of the sample; 2) challenged whether, in fact, the urinalysis was even a sample from the Petitioner based on the fact that it allegedly arrived in Philadelphia on the same day; 3) demonstrated that Petitioner could not have metabolized amphetamines fast enough to produce a positive test result early in the day and a negative test result the same afternoon; 4) emphasized the importance of timely testing the split sample in order to scientifically confirm the reliability of the original testing, and that as a result of the lengthy delay, both tests should have been voided; 5) informed the hearing officer that the lab, under federal workplace testing, needed to confirm the results by analysis of the split sample, and that there was no indication that the confirmation test was performed; 6) demonstrated that the Petitioner's two hair sample toxicology tests, analyzed on September 20, 2007, and October 20, 2007, produced negative results for any illegal or prescription substance during the preceding 90 to 120 days; 7) shown that the original testing was not reliable and the result devoid of any scientific support; and 8) testified to the number of federal violations in collecting Petitioner's sample.

87.     After HO Crehan precluded Expert Stoltman from testifying, Petitioner attempted to read Expert Stoltman's testimony, in the form of an Affidavit, into the record. HO Crehan also denied this request.  Appendix F, p. 148; Exhibit I.

88.     Petitioner also attempted to present evidence of his two separate negative toxicology hair sample tests in order to scientifically challenge the validity and accuracy of Union Pacific's test results.  Appendix F, pp. 115-116.

89.     HO Crehan denied Petitioner the opportunity to present these negative hair sample test results.  Appendix F, pp. 115-119.

12

90.     Cagle testified that Petitioner twice timely requested testing of a split-sample, the split-sample was not tested, and that this failure was a violation of Union Pacific's Drug and Alcohol Policy.  Appendix F,  pp. 82-83; 87.

**COUNT I**
**THE PLB's AWARD FAILS TO MEET THE REQUIREMENTS**
**OF DUE PROCESS**

91.     Petitioner hereby incorporates by reference paragraphs 1-90 above as though fully set forth herein.

92.     Due Process during an investigation and disciplinary process has the same meaning and offers the same protections as it does under the United States Constitution. See Award No. 14031 (NRAB, Div. 3); Award No. 20168 (NRAB, Div. 1); Award No. 3584 (NRAB, Div. 4); Public Law Board No. 6076, Award No. 11; and Public Law Board No. 6942, Case 31.  Appendix C-8 through C-12.

93.     In issuing its Award, the PLB failed to identify and rectify the following due process violations committed by the MRO, HO Crehan, and Union Pacific.

**The MRO's Due Process Violations**

94.     On an initial drug test, a result below the cutoff concentration must be reported as negative.  49 C.F.R. § 40.87.  Appendix D-9.  The initial cutoff concentration for amphetamines is 1000 ng/mL.  Measurements below the threshold level are unreliable.

95.     Petitioner's Sample was positive for amphetamines at 711 ng/mL, below the initial cutoff concentration of 1000 ng/mL.  Thus, the threshold levels in the MRO's report fell below those required for reporting a positive result.  Nevertheless, the MRO reported the test as positive.

96.     The MRO was required to evaluate information that casts doubt on a positive drug test.  After Petitioner denied using any drugs and offered a list of his prescription medications to the MRO, the MRO was obligated to investigate whether Petitioner's medication may have played a role in causing a false-positive.  There is no evidence that the MRO ever attempted any such investigation.  49 C.F.R § 40.33; 49 C.F.R. § 219.707. Appendix D-2 and D-3.

97.     Once Petitioner asserted that the positive test might be the result of prescription medication, the MRO was obligated to review and take all reasonable and necessary steps to verify the authenticity of all medical records provided by Petitioner. There is no record evidence indicating that the MRO complied with this federal regulation. 49 C.F.R. §40.141.  Appendix D-1.

98.     After receiving the written request from Petitioner, the MRO failed to provide Petitioner, within 10 business days, with copies of any records pertaining to Petitioner's use of alcohol and/or drugs, including results of Petitioner's DOT-mandated drug and/or alcohol tests.  The MRO also should have disclosed, within 10 days, the records relating to the results of the Petitioner's drug test (i.e., laboratory report and data package) to the Petitioner.  The MRO failed to abide by any of these obligations in violation of federal regulation. 49 C.F.R. §40.329.  Appendix D-4.

99.     On September 13, 2007, within 72 hours of the MRO's positive test notification, Petitioner requested a split-sample test.  Despite Petitioner's timely request, the MRO did not honor his right to a split specimen test. 49 C.F.R. §40.171.  Appendix D-6.

100.    On October 4, 2007, Petitioner made a second request for a split-sample test. Again, the MRO failed to comply, violating federal regulations.  49 C.F.R § 40.171; 49 C.F.R § 40.173.  Appendix D-6 and D-7.

101.    As a result of these transgressions, Petitioner was unable to examine the evidence presented against him prior to the on-property investigation hearing.  Therefore, the MRO violated Petitioner's right to due process and his contractual right to a fair hearing on the merits.

**HO Crehan's Due Process Violations**

102.    HO Crehan's denial of Petitioner's right to present his expert witness and evidence in his defense, including two negative toxicology tests, denied Petitioner his right to due process, to a fair and impartial hearing on the merits, and breached the CBA.

103.    Petitioner had a due process right to collect independent scientific evidence and offer it into evidence for consideration.  When the HO precluded Petitioner from

offering his negative test results, HO Crehan denied Petitioner his due process rights.  See Public Law Board No. 4354, Award No. 1.  Appendix C-13.

104.   HO Crehan prevented Petitioner from offering testimony challenging the collection and chain of custody of Petitioner's September 4, 2007, 5:10 a.m. sample.  This calls into question the validity of the test results and violated Petitioner's right to due process.  49 C.F.R. § 40.43.  Appendix D-10.

105.   Petitioner was never afforded the opportunity to challenge the positive test result and the fact that the urinalysis was received in Philadelphia on the same day the sample was collected in Tucson.  In a similar case, the PLB expressed "serious concerns as to why the Carrier officials at the investigation hearing did not attach any significance to the fact that the second sample tested was negative."  Public Law Board 4354, Award No. 1, p. 3.  Appendix C-13.

106.   The HO failed to take into account that Union Pacific did not produce any witnesses to validate the test or substantiate the charges of illegal drug use.  Union Pacific did not produce the MRO to testify.  No medical professional involved in the chain of custody of Petitioner's sample testified or was made available for cross-examination.

107.   After Petitioner successfully raised the fact that the split-sample was never tested in violation of Union Pacific policies, and after HO Crehan initiated an ex-parte communication with Union Pacific's drug testing officials, the MRO tested the split-sample at Union Pacific's request in violation of federal regulations.

108.   HO Crehan's ex-parte communications with key Union Pacific officials during the course of the on-property investigation hearing violated Petitioner's right to due process.

109.   Petitioner testified that the collection technician did not follow certain mandated procedures while collecting Petitioner's Sample.  Once Petitioner raised these questions, a fair and impartial hearing officer should have required Union Pacific to present the testimony of the collection agent to refute these allegations.  Only a competent witness familiar with the case should have been called to present evidence and to be subject to

cross-examination.  See Special Board of Adjustment No. 910, Award No. 316.  Appendix C-14.

110.    During a recess in the on-property investigation hearing, HO Crehan generated evidence by sending himself a fax transmission, then used the fax to cross-examine Petitioner on the possibility of sending a blank piece of paper to generate a fax report.  Appendix F, pp. 121-125.

111.    HO Crehan generated his own evidence for the sole purpose of attempting to impeach Petitioner's claims that he sent valid fax transmissions requesting testing of his split-sample.  In doing so, HO Crehan clearly crossed the line from impartial fact gatherer to prosecutor, judge, and jury, in violation of Petitioner's due process rights.

112.    HO Crehan demonstrated improper prejudice by generating his own evidence and commenting on the veracity of evidence presented by Petitioner.

113.    HO Crehan ignored the burden of proof that requires substantial evidence to support the conclusion that a drug violation has occurred and by doing so, violated Petitioner's due process rights.

114.    Every effort must be exerted so that employees are dismissed from service only when there is substantial evidence to support the conclusion that a drug use violation took place.  HO Crehan did not honor his obligations in this regard.  See Public Law Board No. 4354, Award No. 1.  Appendix C-13.

115.    HO Crehan violated Petitioner's due process rights when he excluded Stoltman, Petitioner's expert witness, because he did not have firsthand knowledge of the chain of custody of Petitioner's sample, then allowed Cagle, who labored under the same lack of direct knowledge, to testify as an expert on the chain of custody and the veracity of the test results.

116.    As a result of HO Crehan's abuse of discretion, procedural errors and misconduct, Petitioner has been denied a fair and impartial hearing to which he is entitled pursuant to the CBA.

117.    HO Crehan violated federal regulations, the RLA, and the CBA--and therefore Petitioner's due process rights--when he adopted an adversarial role at the hearing.

118.    HO Crehan's conduct throughout the hearing was prejudicial and denied Petitioner his contractual right to a fair and impartial hearing.  Pursuant to PLB precedent, Petitioner was denied a fair and impartial investigation. See Public Law Board No. 3785, Award No. 1; Public Law Board No. 5942, Award No. 43; Public Law Board No. 6113, Award No. 1; Award No. 3584 (NRAB, Div. 4).  Appendix C-15, C-1, C-16 and C-10.

**Union Pacific's Due Process Violations**

119.    Union Pacific failed to uphold its responsibility to insure that the MRO complied with his obligation to provide Petitioner with the litigation packet.  49 C.F.R. §40.11 (Appendix D-5) provides, in pertinent part:

> (a) As an employer, you are responsible for meeting all applicable requirements and procedures of this part;
>
> (b) You are responsible for all actions of your officials, representatives, and agents (including service agents) in carrying out the requirements of the DOT agency regulations;
>
> (c) All agreements and arrangements, written or unwritten, between and among employers and service agents concerning the implementation of DOT drug and alcohol testing requirements are deemed, as a matter of law, to require compliance with all applicable provisions of this part and DOT agency drug and alcohol testing regulations.  Compliance with these provisions is a material term of all such agreements and arrangements."

120.    Union Pacific was also responsible for making sure that the MRO complied with Petitioner's timely request to test the split-sample.  Union Pacific failed in this regard. 49 C.F.R. § 40.173(a).  Appendix D-7.

121.    Union Pacific has refused to provide Petitioner with any reports from the MRO to determine whether the MRO reviewed and took all reasonable and necessary steps to verify the authenticity of all medical records provided by Petitioner.  49 C.F.R. § 40.141. Appendix D-1.

122.   Union Pacific failed to uphold its responsibility to insure that the MRO complied with his obligation to provide Petitioner, within 10 business days of receiving Petitioner's written request, the records relating to the results of Petitioner's drug test (i.e., laboratory report and data package).  49 C.F.R. §40.11.  Appendix D-5.

123.   Union Pacific was also responsible for making sure that the MRO complied with Petitioner's timely request to test a split-sample.  Again, Union Pacific failed in this regard.  49 C.F.R. § 40.173(a).  Appendix D-7.

124.   Union Pacific also failed to provide Petitioner with copies of any records pertaining to Petitioner's use of alcohol and/or drugs, and all records relating to the results of Petitioner's drug tests within ten (10) days of Petitioner's written request in violation of federal regulations.  49 C.F.R. § 40.329; 49 C.F.R. § 40.11.   Appendix D-4 and D-5.

125.   The Union, on behalf of Petitioner, requested production of the litigation packet, which contained information critical to Petitioner's defense, from Union Pacific.  In violation of federal regulation and Petitioner's right to due process, and despite repeated requests for its production, Union Pacific has never disclosed the litigation packet to either Petitioner or his Union representative.  49 C.F.R. § 40.329 (Appendix D-4); Appendix F, pp. 113-114.

126.   The CBA requires that an employee will not be disciplined without just and sufficient cause as determined by a thorough, fair and impartial investigation in which he is afforded the opportunity to present witnesses.  Even though it had an affirmative obligation to develop all the material facts necessary to insure a fair and impartial investigation, Union Pacific never attempted to afford Petitioner proper due process.  See Award No. 19873 (NRAB, Div. 1); Special Board of Adjustment No. 910, Award No. 372; Special Board of Adjustment No. 910, Award No. 316 and Public Law Board No. 2439, Award No. 165. Appendix C-17, C-18, C-14 and C-19.

127.   Union Pacific violated the CBA and Petitioner's due process rights when it failed to have the MRO available to testify.  As a result, Petitioner was denied the

opportunity to confront and cross-examine the MRO regarding the results and testing of his urinalysis.  Instead of securing proper witnesses, Union Pacific elected to present its case against Petitioner on hearsay testimony.

128.   Even after Petitioner raised a challenge to the collection method, the chain of custody, and the results of the test of his Sample, Union Pacific had ample opportunity (through multiple recesses) to obtain and produce witnesses with first-hand knowledge of these issues.  Union Pacific's failure to secure witnesses with direct knowledge of the matters in controversy violated Petitioner's due process rights.

**The PLB's Due Process Violations**

129.   The RLA requires that the PLB must be presented with a full statement of facts and all supporting data bearing upon the disputes.

130.   The PLB is charged with deciding whether the on-property investigation hearing satisfied all mandated procedural and due process requirements.

131.   The procedural rights that pertain to an on-property investigation hearing require that Union Pacific conduct a fair and impartial hearing, that the employee be entitled to be heard and present evidence, and that the hearing officer receive all evidence at the formal investigation.

132.   Because Petitioner was denied the opportunity to develop his case and defenses to Union Pacific's charges and have its merits fairly judged at the investigation hearing, the PLB's reliance on the on-property investigation hearing record violates the RLA and its spirit, and deprived Petitioner of his right to due process.

133.   In rendering its decision, the PLB relied on a letter from the MRO, which stated, "It is scientifically possible for a specimen to be positive on a test early in the day and negative later in the day."  Exhibit J.  The PLB, however, failed to acknowledge that HO Crehan precluded Petitioner's expert witness and denied Petitioner the opportunity to confront and cross-examine the MRO.  As a result, the Petitioner was denied due process.

134.   When making its decision, the PLB stated that, "Allegedly, the request for the split-sample was made to the Medical Review Officer, which the Medical Review Officer denies receiving.  However, at the request of the Carrier, the split-sample was tested and was positive."  Exhibit A.  Record evidence and federal regulations, however, establish that Union Pacific was prohibited from requesting the split-sample test.  By failing to recognize and remedy this violation, the PLB violated Petitioner's due process rights.

135.   PLB precedent supports the position that Petitioner was denied a fair and impartial hearing.  See Public Law Board No. 2774, Award 113; Public Law Board No. 5942, Award No. 43; Public Law Board No. 2439, Award No. 165.  Appendix C-20, C-1 and C-19.

## COUNT II
## THE PLB FAILED TO CONFINE ITSELF TO MATTERS WITHIN ITS JURISDICTION

136.   Petitioner hereby incorporates by reference paragraphs 1-135 above as though fully set forth herein.

137.   All evidence tending to prove or disprove the charges must be submitted at the on-property investigation hearing.  The record closes upon the conclusion of the on-property investigation hearing.  Thereafter, the parties are not allowed to present evidence or offer testimony to the PLB.

138.   The PLB's award must have a basis that is at least rationally inferable, if not obviously drawn, from the purpose of the CBA. The PLB's decision did not draw its essence from the CBA and lacked a rational foundation, and as such, the Board exceeded its jurisdiction.   *Union Pacific v. United Transportation Union*, 820 F.Supp. 1198 (D.Neb.1993).  An arbitration award fails to derive its essence from the agreement when (1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on 'general considerations of fairness and equity' instead of

the exact terms of the agreement.  *Dallas & Mavis Forwarding Co. v. General Drivers, Warehousemen & Helpers, Local Union 89,* 972 F.2d 129, 134 (6th Cir.1992) (quotations omitted), *cert. denied,* 506 U.S. 1051 (1993).

139.   In its decision, the PLB indicated that the results of Petitioner's drug test were verified by the MRO as positive for amphetamines and methamphetamines at 711 nanograms per milliliter (ng/mL).[2]  The drug test should not have been reported as positive, however, because the initial cutoff concentration for amphetamines is 1000 ng/mL. Measurements below the threshold level are inherently unreliable.

140.   In its decision, the PLB concluded that Union Pacific was not obligated to follow federal regulations requiring it to provide Petitioner with copies of any records pertaining to Petitioner's use of alcohol and/or drugs, and records relating to the results of Petitioner's drug tests within ten (10) days of receiving Petitioner's written request.  Exhibit A, p. 2.  In doing so, the PLB exceeded its jurisdiction.  49 C.F.R. § 40.329; 49 C.F.R. § 40.11.  Appendix D-4 and D-5.

141.   In its decision, the PLB stated that, "There is no question the Carrier proved the Claimant violated its Drug and Alcohol Policy for the second time.  In fact, if one were cynical, it would appear the Claimant began his defense by alleging an injury at El Paso knowing full well he would get a second test.  The Claimant was not a new employee who was unfamiliar with how the Carrier enforces its Drug and Alcohol Policy.  The Claim will be denied."  Exhibit A, p. 2.  The PLB's responsibility is to interpret the CBA and base its decision on the facts of the case.  The PLB's commentary violates the spirit and policy underlying the RLA, the CBA, and federal regulations.

142.   The PLB's comment that Petitioner fell in order to get a second test is not substantiated by any evidence on the record.  As a result of the PLB's failure to carry out

---

[2]   The PLB's comment that the result from the MRO included methamphetamines was incorrect and was not supported by any evidence.  The report entered into evidence and on the record had only shown a positive result for amphetamines.

the aims of the RLA, the CBA, and federal regulations, and by inserting facts and hyperbole into the record, it has exceeded its jurisdiction.

143.   All proceedings conducted by an arbitrator are to conform to the contractual obligations of the parties. 29 C.F.R. § 1404.13.  Appendix D-8.

144.   "Arbitrators are encouraged to render awards not later than 60 days from the date of the closing of the record as determined by the arbitrator, unless otherwise agreed upon by the parties or specified by law."  29 C.F.R. § 1404.14(a).  Appendix D-11.

145.   The agreement to arbitrate "shall fix a period from the beginning of the hearings within which the said PLB shall make and file its award:  Provided, that the parties may agree at any time upon an extension of this period." 45 U.S.C. § 158(i).

146.   The Agreement to Arbitrate between Union Pacific and the Union provides that an arbitration decision shall be rendered within 30 days.  In this case, there was no agreement to extend that period.

147.   The PLB's hearing concluded on September 11, 2008.  The PLB did not render its decision until December 16, 2008, 97 days after the hearing.

148.   The PLB's jurisdiction is limited to the scope of the agreement between Union Pacific and the Union.  The PLB did not comply with the requirements of the RLA when it failed to decide the case within the time provided in the agreement between the parties to render an award within 30 days.   Therefore, because the PLB rendered its decision 97 days after the hearing (67 days late), the PLB exceeded its jurisdiction.

149.   The PLB's decision indicates that, "The Claimant allegedly requested the litigation package of the two labs that tested his samples.  As far as this PLB knows, Claimant has not been furnished this information.  However, it is not the responsibility of the Carrier."  Exhibit A, p. 2.  Pursuant to federal regulations, however, Union Pacific was required to disclose the litigation packet.  As a result of the PLB's clearly erroneous ruling, it acted outside of its jurisdiction in misinterpreting federal regulations.  49 C.F.R. § 40.329; 49 C.F.R. § 40.11.  Appendix D-4 and D-5.

22

150.   The PLB's decision notes that, "Upon arrival in El Paso, Claimant asserted he fell and hurt his tail bone (there were no witnesses to the alleged fall and injury) and was subjected to a "for cause" drug and alcohol test at 3:51 p.m.  That test, which was on the very same day, was verified as a negative test."  Exhibit A, p. 1.  The comment that there were no witnesses to Petitioner's fall was not based on any evidence in the record.[3]  By injecting facts not in evidence, the PLB exceeded its jurisdiction.

151.   The PLB failed to recognize that Petitioner had constitutional and contractual rights to present his witnesses and evidence to insure his case was decided on the merits. Because the Award was arbitrary, capricious, and not supported by substantial evidence, the PLB exceeded its jurisdiction.

152.   The procedural rights that pertain to an on-property investigation hearing are those established by the CBA.  It is, of course, the PLB that must decide whether the on-property investigation hearing satisfied the CBA's procedural requirements.  PLB precedent dictates that a claimant shall not be suspended nor dismissed from service without a fair and impartial trial.  "This provision is a guarantee by the Carrier that it will deal impartially with the employee in accordance with the commonly accepted standards of fairness.  It means that not only will there be a complete investigation, but that there will also be a complete and fair trial.  And that in the conduct of that trial it will present all the material facts -- those which favor as well as those which are adverse to the Claimant -- in order that it may determine upon the full record the imposition of sanctions is warranted."  Award No. 20094 (NRAB, Div. 1), p. 2.  Appendix C-21.  Not only do the contractual provisions of a fair trial demand the submission of all relevant information, but such a submission is also necessary for the protection of the Carrier's interest.  *Id.*

---

[3] Petitioner would testify that there *were* witnesses to the fall.

153.    The PLB's decision was not in conformity with the CBA, which required that the Petitioner be afforded a fair opportunity to present his defenses and claims through evidence in the proceedings.  Accordingly, the PLB exceeded its jurisdiction.

154.    The PLB exceeded its jurisdiction because its Award lacks foundation in reason or fact.

155.    The PLB has denied Petitioner his right to due process, has failed to comply with the requirements of the RLA and the CBA, and has failed to conform or confine itself to matters within the scope of its jurisdiction.

## COUNT III
## THE AWARD VIOLATES PUBLIC POLICY

156.    Petitioner hereby incorporates by reference paragraphs 1-155 above as though fully set forth herein.

157.    Well-defined, dominant public policy dictates that Petitioner be afforded a fair, impartial, complete hearing on the merits consistent with the principles of procedural due process.

158.    For the reasons articulated in paragraphs ____through 154 above, the PLB's Award violates public policy and should be vacated.

## CLAIM FOR RELIEF

WHEREFORE, Petitioner respectfully requests the following relief:

1.    That the Court set aside Award No. 146 of Public Law Board No. 6712, and reinstate Petitioner to service with seniority with all other rights unimpaired;

2.    That Petitioner be awarded back pay and vacation credits effective from September 13, 2007;

3.    That Petitioner's personnel record be cleared of all charges;

4.    For Petitioner's attorney's fees and costs incurred herein; and

5.    For such other and further relief as the Court deems appropriate.

1

DATED this 14th day of December, 2010.

2

**JACOBSON LAW FIRM**

3

4

 /s/  Jeffrey H. Jacobson

Jeffrey H. Jacobson

5

Attorney for Petitioner

6

7

Electronically filed via the CM/ECF system

this 14th day of December 2010.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBITS

INDEX OF EXHIBITS

| | |
|---|---|
| EXHIBIT A | Award No. 146 of Public Law Board No. 6712 |
| EXHIBIT B | September 13, 2007, Notice of Formal Investigation |
| EXHIBIT C | September 13, 2007, first request for split-sample test |
| EXHIBIT D | September 19, 2007, first hair-sample test results |
| EXHIBIT E | October 4, 2007, second request for split-sample test |
| EXHIBIT F | October 19, 2007, second hair-sample test results |
| EXHIBIT G | December 7, 2007, Notice of Discharge |
| EXHIBIT H | September 4, 2007, initial test sample showing received same day in Philadelphia  as collected in Tucson |
| EXHIBIT I | Affidavit of Mark Stoltman, forensic toxicologist |
| EXHIBIT J | Letter from MRO stating that a test could be positive early in the day and negative later in the day |

# PUBLIC LAW BOARD NO. 6712

Case No. 146<br>
Award No. 146

| | | |
|---|---|---|
| United Transportation Union | ) | |
| | ) | |
| vs | ) | **PARTIES TO DISPUTE** |
| | ) | |
| Union Pacific Railroad Company | ) | |

## STATEMENT OF CLAIM

Request of R. W. Bradford, Kansas City Service Unit, for removal of a Level 5 discipline assessment from his personal record, reinstatement to service with seniority unimpaired, compensation for all time lost and restoration of vacation credits from on or about September 12, 2007, until he is returned to service. Claim includes payment for all wage equivalence to which Claimant is entitled, such as medical and dental benefits and for any monetary loss for such coverage while dismissed from service.

## FINDINGS

This Board finds the parties herein are Carrier and Employee within the meaning of the Railway Labor Act, as amended, and that this Board has jurisdiction over the dispute involved herein. The parties to said dispute were given due and proper notice of hearing thereon.

On December 7, 2007 the Carrier dismissed the Claimant. As a result of an investigation that began on October 24, 2007 and was concluded on November 30, 2007 the Carrier found the Claimant violated its Drug and Alcohol Policy on Tuesday September 4, 2007 at Tucson, Arizona.

The Claimant who has 28 years of service and is over 50 years of age started railroad employment June 15, 1979. He first tested positive for drugs in July 2006 and was terminated. He was returned to service on a leniency basis in October 2006. On September 4, 2007 he reported for work in Tucson and was subjected to an FRA random follow-up Drug and Alcohol test. The results of that test were verified by Carrier's Medical Review Officer as positive for amphetamines and methamphetamines at 711 nanograms per milliliter (ng/mL). The Federal threshold for reporting a positive result for amphetamines and methamphetamines is 500 ng/mL. A test of Claimant's split sample was also verified positive for amphetamines and methamphetamines at 711 ng/mL.

After submitting to the 5:10AM follow-up test in Tucson, Claimant boarded his train and traveled to El Paso. Upon arrival in El Paso, Claimant asserted he fell and hurt his tail bone (There were no witnesses to the alleged fall and injury) and was subjected to a "for cause" drug and alcohol test at 3:51 PM. That test was verified as a negative test.

EXHIBIT A

The Organization challenged the Carrier on the negative test after the positive test. The MRO who is not a Carrier employee wrote the following:

RE: Robert Bradford Jr.
xxx-xx-9446

Dear Ms. Lyons:

At the request of Union Pacific, we have reviewed chain of custody numbers 54111478 and 53335854. For reference, chain of custody number 54111478 was collected on 9-4-07 at 5:10 a.m. and was verified positive for amphetamine and chain of custody number 53335854 was collected on 9-4-07 at 3:51 p.m. and was negative.

It is scientifically possible for a specimen to be positive on a test early in the day and negative later in the day. We continue to rely on the laboratory's reports.

Sincerely,

/s/ Benjamin Gerson
Benjamin Gerson, MD
Medical Review Officer

The entire position of the Organization is that there were varied procedural errors.

First, the Claimant asked that the split sample of the morning test be tested. Allegedly the request was made to the MRO, which the MRO denies receiving. However, at the request of the Carrier the split sample was tested and was positive.

Second, the Claimant allegedly requested the litigation package of the two labs that tested his samples. As far as this Board knows, Claimant has not been furnished this information. However, this is not a responsibility of the Carrier.

Claimant also had his own test done, which the Carrier would not let in the record on the basis the results of the Claimant's witness had nothing to do with tests of September 4, 2007.

There is no question the Carrier proved the Claimant violated its Drug and Alcohol Policy for a second time. In fact, if one were cynical, it would appear the Claimant began his defense by alleging an injury at El Paso knowing full well he would get a second test. The Claimant was not a new employee who was unfamiliar with how the Carrier enforces its Drug and Alcohol Policy.

The Claim will be denied.

## **AWARD**

Claim denied.

_____
R.G. Richter, Chairman
Neutral Member


_____
Jay Reilly
Carrier Member

Dated 12/16/2008
_____

DISSENT ATTACHED
_____
J. Kevin Klein
Employee Member


3

## ORGANIZATION'S DISSENT TO PLB 6712 Award 146

The MRO's report of positive results for amphetamine use should not have been relied upon to prove Claimant Bradford violated a mandatory FRA drug test. The detailed drug test documentation was never provided to Claimant throughout nearly three months of Carrier handling through three separate discipline hearing dates, and continuing to the date of the arbitration hearing nearly a year later. The Board acknowledges this fact, as does the Carrier. However, the Board erroneously stipulates that "this is not a responsibility of the Carrier."

The Organization strenuously disagrees with this statement, and further argues that withholding these detailed records, commonly known as the "litigation package", constitutes an insurmountable procedural error, since Claimant was denied any opportunity to defend himself based on the science. The pertinent section of the federal regulations read:

§ 40.329   What information must laboratories, MROs, and other service agents release to employees?
        (a) As an MRO or service agent you *must* provide, within 10 business days of receiving a written request from an employee, copies of *any* records pertaining to the employee's use of alcohol and/or drugs, including records of the employee's DOT-mandated drug and/or alcohol tests. You may charge no more than the cost of preparation and reproduction for copies of these records.
        (b) As a laboratory, you must provide, within 10 business days of receiving a written request from an employee, and made through the MRO, *the records relating to the results of the employee's drug test (i.e., laboratory report and data package).* You may charge no more than the cost of preparation and reproduction for copies of these records.  (emphasis added)

The regulations further emphasize that the Carrier is *directly responsible* for the performance of the MRO and the testing labs even though they may not be salaried employees of the Carrier. The Carrier may not, as a matter of law, insulate itself from the actions of the MRO or the testing labs:

§ 40.11   What are the general responsibilities of employers under this regulation?
        (a) As an employer, you are responsible for meeting all applicable requirements and procedures of this part.
        (b) You are responsible for *all actions of your officials, representatives, and agents (including service agents)* in carrying out the requirements of the DOT agency regulations.
        (c) *All agreements and arrangements, written or unwritten, between and among employers and service agents concerning the implementation of DOT drug and alcohol testing requirements are deemed, as a matter of law, to require compliance with all applicable provisions of this part and DOT agency drug and alcohol testing regulations. Compliance with these provisions is a material term of all such agreements and arrangements.* (emphasis added)

It is well established in the record, and acknowledged by the Board, that Claimant never received the "litigation package", despite his well documented

requests.  Claimant thus had no way of defending himself from the scientifically unsupported conclusions of the MRO.  The Claimant has an absolute right to examine the testing records to determine their scientific validity.  Otherwise, an innocent employee is powerless to prove his innocence.  Access to the "litigation package" is the most basic "due process" guarantee contained in the federal drug regulations, and the Carrier is directly responsible, as a matter of law, for withholding it from the Claimant and sabotaging his affirmative defense.

In addition, Claimant's timely request for testing of the split sample was not honored.  Claimant presented ample evidence that he had made such a timely request, although whether he actually did so was a matter of dispute, and therefore subject to arbitral review.  However, the Board does not comment upon the critical factual question of whether the Claimant did make a timely request for testing of the split sample within 72 hours of notification of the primary test sample results.

The Board does remark that the split sample was tested, months later, "at the request of the Carrier."  Yet the Carrier is *prohibited* from making such a request. The FRA's published interpretive guidelines (transcript exhibit 20) emphasizes that *only* the employee may make such a request, that the request may be verbal or in writing, and that neither an employer nor a union may request split sample testing, whether it purports to do so on its own initiative or as proxy for the employee.  Furthermore, the improperly reported split sample results were, like the primary sample, unsupported by scientific data contained in the "litigation package", and cannot be relied upon.

Claimant presented a great deal of exonerating evidence, and also raised other objections about the testing procedures and hearing procedures.  The Board is not obligated to accept the Organization's characterization of Claimant's exonerating evidence, nor to conclude that every procedural violation is fatal to the Carrier's case.

However, the Carrier failed to provide the Claimant with the scientific records that were the purported basis for the MRO's conclusions.  Withholding these documents is not a minor procedural error.  The willful, and continuing, failure to provide the "litigation package" contradicts the Carrier's elementary due process obligation under the federal regulations, and is fatal to its case against the Claimant.

J. Kevin Klein
Organization Member PLB 6712
January 5, 2009

TSU-DR

# UNION PACIFIC RAILROAD COMPANY

JAMES C. SIMS
Superintendent



1255 So. Campbell Ave.
Tucson, AZ 85713
(520) 629-2120
Fax (520) 629-2294

TUCSON SERVICE UNIT

December 7, 2007
Emp ID No: 0035618
Incident Dates: 09-04-07

**US CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. R. W. Bradford Jr.
PO Box 68967
Oro Valley AZ 85737-0008

## NOTIFICATION OF DISCIPLINE ASSESSED

Dear Mr. Bradford:

Reference the transcript of investigation sent to you under separate cover on December 6, 2007.  After carefully considering the evidence adduced at the Hearing and Investigation held in Tucson, Arizona, on October 24, 2007, and reconvened on November 19, 2007 and November 30, 2007, I find the following charges against you have been sustained:

> You tested positive for illegal drugs after taking an FRA follow-up test, in accordance with Union Pacific Railroad's Drug and Alcohol Policy at 0510 hours, on Tuesday, September 4, 2007, at Tucson, Arizona, while you were employed as a Conductor on IHJMNX.

Under the UPGRADE Progressive Discipline Table, this violation requires the assessment of LEVEL 5, which is **PERMANENT DISMISSAL**. Therefore, your record, this date, has been assessed a LEVEL 5 violation of the UPGRADE Discipline Policy and you are hereby dismissed from the service of Union Pacific Railroad Company.

Please immediately deliver all Company property including company radios, ID Card, Rule Book, lantern, etc., in your possession to the Tucson Yard Office.

Sincerely,

James C. Sims
Superintendent

cc:   G. W. Crest, LC-UTU, 606 South Plumer Ave, Tucson AZ  85719-7043
            - US Certified Mail
      J. K. Klein, GC-UTU – Lotus Notes
      Brian H. Crehan, SMTO, Conducting Manager – Emailed
      David A. Cagle, Safety, Western Region, Charging Manager – Emailed
      P. L. Lyons, Manager Regulatory Compliance – Emailed
      Linda S. Jensen, Personnel Records - Emailed
      Seniority (Omaha) – Lotus Notes
      CMS – Omaha

EXHIBIT B



```
***********************
***   TX REPORT   ***
***********************

TRANSMISSION OK

TX/RX NO                    3806
CONNECTION TEL                      12156376328
SUBADDRESS
CONNECTION ID
ST. TIME              09/13 15:46
USAGE T               01'02
PGS.                     1
RESULT                OK
```

September 13, 2007

Robert William Bradford Jr.

Ss# 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

P. O. Box 68967
Oro Valley, Az.

I am requesting that my split urine sample
be re-tested

I am faxing this request to Dr. Barnett at
University Services
Fax # 1-215-637-6328

Thank-you

EXHIBIT C

# Ω OMEGA

| | |
|---|---|
| Requesting Agency: | LAN#: 431410 |
| Drug Free Works | Specimen ID: 0526206 |
| 700 West Orange Grove | Reason For Test: Personal |
| Tuscon, AZ. 85704 | Date Collected: 9/19/2007 |
| Telephone: 520-235-6503 | Date Received: 9/20/2007 |
| | Date Reported: 9/20/2007 |

Donor ID:  **Bradford, Robert W Jr**                 SSN:    **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**

---

Test(s) Requested:  **Hair 5 Drug Panel**

The standard Hair 5 Drug Panel Test includes the testing of the 5 major drug classes.
These include:
Amphetamines - Amphetamine, Methamphetamine and Ecstasy (MDMA)
Cocaine - Cocaine/Cocaine Metabolites
Opiates - Codeine, Morphine, Heroin Metabolite
Phencyclidine(PCP)
THC Metabolite(Marijuana)

| Drugs Tested For | Result | Screening Cut Off | Confirmation Cut off |
|---|---|---|---|
| | | picograms per milligram | picograms per milligram. |
| Amphetamines | Negative | 500 pg/mg | |
| Cocaine/Metabolites | Negative | 500 pg/mg | |
| Opiates | Negative | 300 pg/mg | |
| Phencyclidine | Negative | 300 pg/mg | |
| THC Metabolite | Negative | 1.00 pg/mg | |

---

**Hair 5 Drug Panel Test Result(s)**

**Negative**

A negative result indicates that none of the drugs listed above were detected at a concentration greater than their listed cutoff levels.

---

**Report Notations**

---

1.5 - 2.0 inches in length (appoximately 0-90,120 day time frame)

Certified By: Tim Prots                          Laboratory Director Dave Engelhart, Ph.D

---

Omega Laboratories, Inc. - 400 N. Cleveland Ave., Mogadors 44260

EXHIBIT D

0526206

**OMEGA**
Laboratories

(330) 628-5748
(800) 665-5569
Fax: (330) 628-5803

1347

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, I.D. No.

Drug Free Works ID# 1347
700 West Orange Grove
Tuscon, AZ, 85704
520-235-8503

B. MRO Name, Address, Phone and Fax No.

C. Donor Name: `B R A D F O R D` `J R` `R O B E R T` `W`
(Last, First, Middle)

Donor SSN or Employee I.D. No. `5 2 7 2 3 9 4 4 6`

D. Reason for Test:   ☐ Pre-employment   ☐ Random   ☐ Reasonable Suspicion/Cause   ☐ Post Accident
☐ Return to Duty   ☐ Follow-up   ☑ Other (specify) _SELF_

E. Drug Tests to be Performed:   ☑ Hair 5 Drug Panel   ☐ Other (specify) _____

F. Collection Site Address:
Drug Free Works
700 W Orange Grove
Tucson AZ 85704

**STEP 2: COMPLETED BY COLLECTOR**

☑ HEAD HAIR   ☐ BODY   | REMARKS

**STEP 3:** Collector affixes seal to pouch. Collector dates seal. Donor initials seal. Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable requirements.

X _____
Signature of Collector

Time of Collection 11:15 am

PATRICK DAIR
(PRINT) Collector's Name (First, MI, Last)

Date (Mo./Day/Yr.) 9/19/07

SPECIMEN RELEASED TO:

COURIER _DHL_

Name of Delivery Service Transferring Specimen to Lab

**RECEIVED AT LAB:**

X _____
Signature of Accessioner

(PRINT) Accessioner's Name (First, MI, Last)

Date (Mo./Day/Yr.)

Specimen Seal Intact
☐ Yes
☐ No, Enter Remark Below

SPECIMEN RELEASED TO:

**STEP 5: COMPLETED BY DONOR**

I certify that I provided my specimen to the collector; that I have not adulterated it in any manner; each specimen used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen is correct.

X _Robert W. Bradford Jr_
Signature of Donor

Robert W. Bradford Jr
(PRINT) Donor's Name (First, MI, Last)

Date (Mo./Day/Yr.) 9/19/2007

Daytime Phone No. (520) 907-5565   Evening Phone No. (___)

Date of Birth 8/25/1957
Mo. / Day / Yr.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

In accordance with applicable requirements, my determination/verification is:

☐ NEGATIVE   ☐ POSITIVE   ☐ TEST CANCELLED

REMARKS _____

X _____
Signature of Medical Review Officer

(PRINT) Medical Review Officer's Name (First, MI, Last)

Date (Mo./Day/Yr.) __/__/__

PRESS HARD - YOU ARE MAKING MULTIPLE COPIES

COPY 5 - DONOR COPY

## HP LaserJet *3050*

# Fax Call Report



HP LASERJET FAX

4-Oct-2007    1:46PM

| Job | Date | Time | Type | Identification | Duration | Pages | Result |
|-----|------|------|------|----------------|----------|-------|--------|
| 2136 | 4/10/2007 | 1:46:00PM | Send | 12156376998 | 0:40 | 1 | OK |

Robert W. Bradford

3320 N. Campbell Avenue, #150

Tucson, Arizona 85719

Re:   Robert William Bradford, Jr.

Soc. Sec.: 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

Dear   Doctor Barnett, MRO:

LabOne, Inc. (or other laboratory used):

This letter is my formal request pursuant to 49 C.F.R. 40.329(a) that I be provided, within 10 business days from today's date, copies of any and all records pertaining to my use of alcohol and/or drugs, including records of any drug and/or alcohol tests. Additionally, pursuant 49 C.F.R. 40.329(b) I request that you forward this request to the laboratory performing and tests pertaining to my use of alcohol and/or drugs and that the laboratory forward, within 10 business days, any and all records pertaining to both testing. The records requested here in should include but not be limited to all records and data maintained or provided and the contents of an "litigation package."

In addition to the forgoing, on September 13, 2007 I requested that the urine sample taken 9-04-07 at 6:10 a.m. be split and re-tested. Please advise as to the status of the retest. If a retest cannot be performed, then it would be appreciated if you could provide details as to why.

Please forward your response for the requested information to:

Robert W. Bradford

3320 N. Campbell Avenue, #150

Tucson, Arizona 85719

Your immediate attention to this matter will be appreciated.

Sincerely,

Robert Bradford

EXHIBIT E

Robert W. Bradford

3320 N. Campbell Avenue, #150

Tucson, Arizona 85719


Re:     Robert William Bradford, Jr.

        Soc. Sec.: 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

Dear    Doctor Barnett, MRO

        LabOne, Inc. (or other laboratory used):

        This letter is my formal request pursuant to 49 C.F.R. 40.329(a) that I be provided, within 10 business days from today's date, copies of any and all records pertaining to my use of alcohol and/or drugs, including records of any drug and/or alcohol tests. Additionally, pursuant 49 C.F.R. 40.329(b) I request that you forward this request to the laboratory performing any tests pertaining to my use of alcohol and/or drugs and that the laboratory forward, within 10 business days, any and all records pertaining to such testing. The records requested here in should include but not be limited to all records and data maintained or provided and the contents of any "litigation package."

        In addition to the forgoing, on September 13, 2007 I requested that the urine sample taken 9-04-07 at 5:10 a.m. be split and re-tested. Please advise as to the status of the retest. If a retest cannot be performed, then it would be appreciated if you could provide details as to why.

        Please forward your response for the requested information to:

        Robert W. Bradford

        3320 N. Campbell Avenue, #150

        Tucson, Arizona 85719

        Your immediate attention to this matter will be appreciated.

        Sincerely,

        Robert Bradford

## Ω OMEGA

**Requesting Agency:**

Drug Free Works

700 West Orange Grove

Tuscon, AZ, 85704

Telephone: 520-235-8503

LAN#: **444560**

Specimen ID: **0526207**

Reason For Test: **Personal**

Date Collected: **10/19/2007**

Date Received: **10/22/2007**

Date Reported: **10/22/2007**

Donor ID: **Bradford, Robert**          SSN: **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**

Test(s) Requested: **Hair 5 Drug Panel**

The standard Hair 5 Drug Panel Test includes the testing of the 5 major drug classes.
These include:
Amphetamines - Amphetamine, Methamphetamine and Ecstasy (MDMA)
Cocaine - Cocaine/Cocaine Metabolites
Opiates - Codeine, Morphine, Heroin Metabolite
Phencyclidine(PCP)
THC Metabolite(Marijuana)

| Drugs Tested For | Result | Screening Cut Off | Confirmation Cut off |
|---|---|---|---|
| | | *picograms per milligram* | *picograms per milligram* |
| Amphetamines | Negative | 500 pg/mg | |
| Cocaine/Metabolites | Negative | 500 pg/mg | |
| Opiates | Negative | 300 pg/mg | |
| Phencyclidine | Negative | 300 pg/mg | |
| THC Metabolite | Negative | 1.00 pg/mg | |

### Hair 5 Drug Panel Test Result(s)

### Negative

A negative result indicates that none of the drugs listed above were detected at a concentration greater than their listed cutoff levels.

### Report Notations

1.5 inches in length (approximately 0-90 day time frame)

Certified By:  Erica Quicci                Laboratory Director Dave Engelhart, Ph.D

**Omega Laboratories, Inc. - 400 N. Cleveland Ave., Mogadore 44260**

EXHIBIT F

0526207

OMEGA
Laboratories

(330) 628-5748
(800) 665-5569
Fax: (330) 628-5603

1347

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, I.D. No.

Drug Free Works ID# 1347
700 West Orange Grove
Tuscon, AZ, 85704
520-235-8503

B. MRO Name, Address, Phone and Fax No.

C. Donor Name: R O B E R T | B R A N D F O R D
(Last, First, Middle)

Donor SSN or Employee I.D. No.: 5 2 7 2 3 9 4 4 6

D. Reason for Test:
☐ Pre-employment    ☐ Random    ☐ Reasonable Suspicion/Cause    ☐ Post Accident
☐ Return to Duty    ☐ Follow-up    ☑ Other (specify) _SELF_

E. Drug Tests to be Performed:   ☑ Hair 5 Drug Panel    ☐ Other (specify) _____

F. Collection Site Address:
Drug Free Works
5813 N Oracle
Tvs AZ 85704

**STEP 2: COMPLETED BY COLLECTOR**

☑ HEAD HAIR    ☐ BODY    | REMARKS

**STEP 3:** Collector affixes seal to pouch. Collector dates seal. Donor initials seal. Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**
I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable requirements.

X _____
Signature of Collector

Time of Collection: 10:05  ☐AM ☑PM

_Khris Spain_
(PRINT) Collector's Name (First, MI, Last)

Date (Mo./Day/Yr.): 10/18/07

SPECIMEN RELEASED TO:

COURIER

Name of Delivery Service Transferring Specimen to Lab

**RECEIVED AT LAB:**

X _____
Signature of Accessioner

_____
(PRINT) Accessioner's Name (First, MI, Last)

Date (Mo./Day/Yr.): ___/___/___

Specimen Seal Intact
☐ Yes
☐ No, Enter Remark Below

SPECIMEN RELEASED TO:

**STEP 5: COMPLETED BY DONOR**
I certify that I provided my specimen to the collector; that I have not adulterated it in any manner; each specimen used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen is correct.

X _____
Signature of Donor

_ROBERT BRANDFORD_
(PRINT) Donor's Name (First, MI, Last)

Date: 10/19/07

Daytime Phone No. (520) 907-5566    Evening Phone No. (____)

Date of Birth: 8/25/55
Mo. Day Yr.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

In accordance with applicable requirements, my determination/verification is:
☐ NEGATIVE    ☐ POSITIVE    ☐ TEST CANCELLED

REMARKS _____

X _____
Signature of Medical Review Officer

_____
(PRINT) Medical Review Officer's Name (First, MI, Last)

Date (Mo./Day/Yr.): ___/___/___

TSU-DR

# UNION PACIFIC RAILROAD COMPANY

JAMES C. SIMS
Superintendent



1255 So. Campbell Ave.
Tucson, AZ 85713
(520) 629-2120
Fax (520) 629-2294

TUCSON SERVICE UNIT

December 7, 2007
Emp ID No: 0035618
Incident Dates: 09-04-07

## US CERTIFIED MAIL
## RETURN RECEIPT REQUESTED

Mr. R. W. Bradford Jr.
PO Box 68967
Oro Valley AZ 85737-0008

## NOTIFICATION OF DISCIPLINE ASSESSED

Dear Mr. Bradford:

Reference the transcript of investigation sent to you under separate cover on December 6, 2007.  After carefully considering the evidence adduced at the Hearing and Investigation held in Tucson, Arizona, on October 24, 2007, and reconvened on November 19, 2007 and November 30, 2007, I find the following charges against you have been sustained:

> You tested positive for illegal drugs after taking an FRA follow-up test, in accordance with Union Pacific Railroad's Drug and Alcohol Policy at 0510 hours, on Tuesday, September 4, 2007, at Tucson, Arizona, while you were employed as a Conductor on IHJMNX.

Under the UPGRADE Progressive Discipline Table, this violation requires the assessment of LEVEL 5, which is **PERMANENT DISMISSAL**. Therefore, your record, this date, has been assessed a LEVEL 5 violation of the UPGRADE Discipline Policy and you are hereby dismissed from the service of Union Pacific Railroad Company.

Please immediately deliver all Company property including company radios, ID Card, Rule Book, lantern, etc., in your possession to the Tucson Yard Office.

Sincerely,

James C. Sims
Superintendent

cc:   G. W. Crest, LC-UTU, 606 South Plumer Ave, Tucson AZ  85719-7043
          - US Certified Mail
      J. K. Klein, GC-UTU – Lotus Notes
      Brian H. Crehan, SMTO, Conducting Manager – Emailed
      David A. Cagle, Safety, Western Region, Charging Manager – Emailed
      P. L. Lyons, Manager Regulatory Compliance – Emailed
      Linda S. Jensen, Personnel Records - Emailed
      Seniority (Omaha) – Lotus Notes
      CMS – Omaha

EXHIBIT G

# UNIVERSITY SERVICES MRO
## Toxicology Services Group

TO: UPRR/D&A/FIELD - DOT          FOR: UPRR/D&A/FIELD - DOT
    DEB GENGLER                        DEB GENGLER
    1400 DOUGLAS ST - STOP 0350        1400 DOUGLAS ST - STOP 0350
    OMAHA, NE 68179                    OMAHA, NE 68179

Date Reported: 09/12/2007         Date MRO Verified: 09/12/2007

This test was conducted in accordance with 49 CFR Part 40 and Part 382.

Name of Individual Tested:  BRADFORD JR, ROBERT

Identification Number:  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          Specimen Number:  54111470

Collection Date:  09/04/2007                 Date Ply2 Received:  09/04/2007

Reason for Test: FOLLOW-UP - FRA             Lab Acct #: 20310996

Specimen Type: URINE

Collection Location:  ADIS - TUCSON
                      1255 S CAMPBELL AVENUE

                      TUCSON          , AZ  85713

Laboratory Performing Analysis:  QUEST DIAGNOSTICS

Status of Drug Test:    VERIFIED POSITIVE -
                                    AMPHETAMINES
                                    AMPHETAMINE


RANDY BARNETT DO
Medical Review Officer

Drugs Tested: AMPHETAMINES,   AMPHETAMINE,   METHAMPHETAMINE, COCAINE METABOLITES,
              MARIJUANA (THC), PHENCYCLIDINE (PCP), OPIATES,

10551 Decatur Road, Suite 200 • Philadelphia, PA 19154 • Tel: (215)637-8800 • Fax: (215)637-6998

## AFFIDAVIT OF MARK STOLTMAN

State of Arizona    )
               ) ss.
County of Maricopa )

I, MARK STOLTMAN, Affiant, being first duly sworn, depose and state the following:

1)     I have the following qualifications as a Forensic Scientist and toxicologist:
        a. Bachelor of Science degree in bio-medical science;
        b. Master of Science in forensic science;
        c. Ph.D. in chiropractic medicine with certifications in physiotherapy;
        d. Forensic Scientist/Toxicologist in the Phoenix Police Department Crime Laboratory analyzing blood and urine for the presence of drugs, alcohol and other toxicants. Instructed police officers on the operation of the breath testing devices, the pharmacology of alcohol and affect of drugs at Drug Recognition Expert (DRE) training. Proficient in using headspace gas chromatography and mass spectrometry and administrative review of blood alcohol and drug reports and analysis of COBRA data; (2004-2006)
        e. Arizona Department of Public Safety and CMI certified as an operator, QAS, and Instructor for the Intoxilyzer 5000, 5000 EN and 8000;
        f. I have received extensive training on HGN and SFST's;
        g. Associate member of the California Association for Toxicologists;
        h. Member of the International Association for Chemical Testing;
        i. Published a case study in the Society of Forensic Toxicologists Quarterly publication;
        j. Contributor for Intoxication Test Evidence 2nd Edition;
        k. Self-employed Forensic Scientist in Arizona specializing in human performance toxicology.
        l. Have qualified and testified in state courts as an expert in forensic toxicology;
        j. Other qualifications which I have as a Forensic Scientist and Toxicologist are more particularly listed in my Curriculum Vitae attached hereto.

2)     I have reviewed the documents and information surrounding the September 4, 2007, 5:10 a.m. urine collection and subsequent analysis and I am of the opinion, based on a reasonable degree of scientific certainty that the analysis and its conclusions are unreliable and cannot be and should not be relied upon. Should the analysis be relied upon then those who rely upon it will be ignoring clear and convincing scientific evidence establish the analysis is unreliable. Such opinion is based on the information more particularly set forth hereafter.

3)     The documents review and relied upon and which form the basis for the opinions stated herein are attached hereto as exhibit 1 through 12 and incorporated herein.

4)     The basis for the opinion expressed herein are as follows:
        a. The September 4, 2007, 5:10 a.m. had the following discrepancies which establish its unreliability.

EXHIBIT I

i.  Based on documentation provided, the 5:10 am test was split into an A and B sample.  Lab One reported the A sample as positive presumably for the A sample and notified the MRO of the results. The lab, under federal workplace testing also needed to confirm the results by analysis of the B sample. There was not indication that this confirmation testing was undertaken.

ii.  September 13, 2007, the day after being given the test results, Mr. Bradford requested a "split" of the urine sample and that a retest conducted.  Exhibits attached hereto confirm the transmission and receipt of Mr. Bradford's request by the office of the MRO.  Such splits are a matter of right to which the donor is entitled and are part of the scientific process to confirm the reliability of the original testing. Without such testing the scientific and confirmation process is compromised and should be canceled.  In spite of Mr. Bradford's timely request, this confirmatory request was apparently ignored and if conducted Mr. Bradford was not given the benefit of the results.

iv.  Again on October 4, 2007 Mr. Bradford requested an analysis of the "split sample."  Again, exhibits attached hereto confirm the transmission and receipt of the request by the MRO's office.  Again, this request to have a confirmatory test performed was apparently ignored thereby compromising the scientific and confirmatory process and casting significant question as to the reliability of the original testing.

iii.  Documentation (exhibit 3) from University Services MRO who apparently analyzed the 5:10 am sample indicates the sample was received in Philadelphia, Pennsylvania on the same day that the sample was taken.  Yet, the collection documentation indicates the sample was placed with DHL for carriage to the laboratory.  This would require that the sample, deposited with DHL for carriage, arrived across the country on the same date.

v.  Federal DOT regulations (40.201E) requires that the results of the testing be cancelled if the B sample is not made available.

b.  Amphetamines in the human metabolism require days to dissipate.  As such, if a subject tested positive in the morning for amphetamines, that same person would also test positive in the afternoon of the same day. On September 4, 2007 at 3:51 in the afternoon of the morning collection, which was reported as positive, Mr. Bradford had another urine sample collected at the request of Union Pacific.  That sample was reported by the same MRO on September 7th as negative.  A negative result hours after the first test at 5:10 am is not consistent and warrants further investigation.  Attempts by Mr. Bradford to investigate have been met with resistance.

c.  Urine testing is used to evaluate a donors exposure to substances at a particular point in time.  Other more reliable methods of testing exist and which actually establish a donors exposure to & use of substances over a

longer period of time.  Hair testing is such a test and is acknowledged by SAMHSA , the accrediting agency which designs testing procedures, as an appropriate testing method,  On September 19th and then again on October 16, 2007, approximately 42 days following the initial urine collection, Mr. Bradford submitted to a collection facility in Tucson, Arizona. An appropriate quantity of hair down to the scalp was removed from his head.  The samples were appropriately handled and transported to Omega laboratories for testing. I am familiar with the testing standards of Omega Laboratories and I am aware that Omega Laboratory is qualified to conduct toxicologic hair testing and such testing meets the requisite scientific standards for test assurance.  Both samples of Mr. Bradford's hair, after scientific analysis, showed he had not been exposed to any illegal or prescription substance for a period of 90 to120 days preceding the taking of the samples.

5) With no further evidence presented, the foregoing clearly and unequivocally establish that the original testing of the September 4, 2007, 5:10 a.m. urine sample of Mr. Robert Bradford cannot and should not be relied upon and that to rely upon such testing would be to do so without any scientific support or basis.

Affiant, further sayeth not.

DATED this _16_ day of _November_____, 2007.

_____
Mark M. Stoltman, BS, DC, MFS

SUBSCRIBED AND SWORN TO before me this _16th_ day of _November_____, 2007, by Mark M. Stoltman.

OFFICIAL SEAL
ERIC WERTZ
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Feb. 8, 2009

_____
Notary Public

My Commission Expires:

FeB. 8, 2009

**Mark M. Stoltman BS, DC, MFS**
Forensic Scientist, Forensic Toxicology
3849 E. Jasper Dr.
Higley, AZ. 85236
Phone: 480-258-1191     Fax: 480-497-1955
mstoltma@qwest.net

**Education:**

| | |
|---|---|
| 1990-1995 | Bachelor of Science, Biomedical Science. Chemistry Concentration. St. Cloud State University, St. Cloud, MN. |
| 1996-2000 | Doctorate of Chiropractic Medicine, Western States Health Science University, Portland, OR. Certifications in Physiotherapy and Radiology. |
| 2003-2005 | Masters of Forensic Science, National University, La Jolla, CA. Masters Thesis on the Drug Recognition Expert (DRE) Program for Phoenix PD. |

**Employment:**

| | |
|---|---|
| 1992-1994 | Brunning Pharmacy, St. Cloud, MN. Pharmaceutical Technician |
| 1995-1996 | US Department of Agriculture, Phoenix, AZ Laboratory Technician and Research Specialist.  Tested and researched pesticide alternatives for biological pest control. Separated and identified microbial enzymes by chromatography and electrophoresis. |
| 2000-2003 | Self employed health care Physician. Mesa, AZ. (Licensed State of Arizona 2001-2002) #8003.  Performed all aspects of patient care including diagnosis of disease, phlebotomy, lab interpretation, and radiology. Trained in medical issues pertaining to human physiology neurology and general pathology. |
| 2004-July 2006 | Phoenix Police Department Crime Laboratory, Phoenix, AZ. Forensic Scientist/Forensic Toxicology.  Performed analyses on blood, urine and breath samples for the presence of alcohol, drugs and other toxicants. Maintained breath alcohol instruments and performed quality assurance procedures on the Phoenix breath testing instruments. Instructed officers' on the effects of alcohol and operation of the Intoxilyzer breath testing instruments. Proficient in using headspace gas chromatography and mass spectrometry (GC/MS) and enzyme immunoassay technique (EMIT). Performed technical and administrative review of blood alcohol and drug reports and analysis of COBRA data. |
| 2005- 2006 | Adjunct Faculty, Mesa Community College. Instructor for Biological Evidence Course AJS 216. Administrative Justice / Forensic Investigation degree program. Course includes forensic toxicology, effects of drugs on the human body, instrumentation, serology, DNA analysis, trace evidence and breath testing. |
| Current Position | Self Employed Forensic Scientist in the field of forensic toxicology. Consultant on cases related to alcohol, drugs and their effect on human performance. |

**Operators Permits:**

> AZ DPS Class I Operator Permit # 29727 - Intoxilyzer 5000
> AZ DPS Class I Operator Permit # 29747 - Intoxilyzer 5000 EN
> AZ DPS Class I Operator Permit #37537 - Intoxilyzer 8000

**Quality Assurance Permits:**

> AZ DPS Class II Operator Permit # 29748 - QAS Intoxilyzer 5000
> AZ DPS Class II Operator Permit # 29749 - QAS Intoxilyzer 5000 EN
> AZ DPS Class II Operator Permit # 33105- QAS Intoxilyzer 8000

**Instructors Permits:**

> AZ DPS Intoxilyzer 5000
> AZ DPS Intoxilyzer 5000 EN
> AZ DPS Intoxilyzer 8000

**Analyst Permit:**

> AZ DPS Blood Alcohol Analyst Permit # 279

**Other Certifications:**

> CMI/AZ DPS Intoxilyzer 8000 Technician #24

> Factory certified in the operation, repair and calibration of the Intoxilyzer 5000 and
> 8000. October 2004.

> Certified in operation, technical aspects, and maintenance for the Guth model 2100
> Simulator. Guth Laboratories, Inc. August, 2004.

> Arizona Board of Chiropractic Physicians. Licensed Physician, Physiotherapy and
> Radiology Certifications. (Inactive)

**Professional Training**

> *CMI – Intoxilyzer 5000 Training* – Factory training on operation, maintenance & repair.
> March, 2004. Owensboro, Kentucky.

> *NHTSA Standardized Field Sobriety Testing and Horizontal Gaze Nystagmus Training.*
> Phoenix PD. April, 2004. Phoenix, AZ.

> *Borkenstein Course on Alcohol.* Indiana University. Effects of Alcohol, breath testing
> and highway traffic safety. May 2004.

> *Intoxilyzer Users Group* - Owensboro, Kentucky (CMI). August 2004.

> *Intoxilyzer 8000 Operators Course.* Arizona Department of Public Safety.
> July, 2004. AZ DPS Lab.

> *Intoxilyzer 8000 Certified Technician Training.* Maintenance, repair and calibration by
> CMI. October, 2004. Gilbert PD, AZ.

* *California Assoc. for Toxicologists Seminar on Depressant Drugs and Antidepressants.* September, 2004. Tempe, AZ.

* *2005 IACT Annual Conference.* Developments in Breath testing and Toxicology. April, 2005. Madison, WI.

* *Drug Recognition Expert Course.* Two week DRE Program. April, 2005. Mesa AZ. Police Academy.

*_GC/MS Training Seminar by Resteck._ Column Chromatography and Mass Spectroscopy training. May, 2005. Arizona Department of Health Services. Phoenix, AZ

*_Society for Forensic Toxicologists - Forensic Toxicology Review._ NY State Police/SOFT. September 2005. Chief Office of the Medical Examiners. Albany, NY.

*_Solid Phase Extraction Training._ October, 2005. SPE Ware/AZ DPS.

*_2006 IACT Conference._ Field Sobriety Testing, Breath Testing and Toxicology. April, 2006. Anaheim, CA.

*2007 IACT Conference. Volatile substances, RFI, Breath temperature, ISO / OIML Standards in breath testing. May, 2007. Wilmington, N. Carolina.

## Presentations:

* Instructor for police officers on the operation of the Intoxilyzer 5000, 5000 EN, 8000 and the pharmacology and pharmacokinetics of alcohol. Arizona Law Enforcement Academy, and Phoenix PD.

* Presenter at the Toxicology Peer Group Meeting. The Drug Recognition Expert Program and the Ability to Predict Drug Impaired Drivers. June, 2004. Phoenix PD.

* Instructor at DRE In-service training. Date rape and rave drugs. October, 2004. Mesa Police Academy

* Presenter on the Intoxilyzer 8000. City of Phoenix Prosecutors Office. October, 2005.

* Presenter at the Toxicology Peer Group Meeting. Date Rape Drug Defense in DUI Trials. Mesa PD crime lab training facility. February, 2006.

* Statistical Evaluation of NHTSA Standardized Field Sobriety Tests. (Predictive Validities, Fact or Fiction) Power Point presentation for criminalists, judges and attorneys. 2006.

* Presenter on the Intoxilyzer 8000 and COBRA Records. September 29th, 2006. ASU College of Law Alumni Association. DUI XXI

*Understanding Blood & Breath testing evidence. Strategies in Handling DWI and DUI Cases. Lorman Education Services. February 27, 2007. Phoenix, AZ.

* Presenter at the 20th Annual Aggressive Defense of the Accused Impaired Driver. "Exposing pseudoscience with an expert" AACJ. Tucson, AZ. May 19th, 2007.

* What you need to know about the Intoxilyzer 8000. September 7, 2007. ASU College of Law Alumni Association. DUI XXII.

**Publications and studies:**

Stoltman, Mark. *The Ability of the Drug Recognition Expert to Evaluate Drug Impaired Drivers.* 2004. Masters Thesis, National University.

Stoltman, Mark. *Case Report Involving Multiple CNS Depressants in Urine.* 2005. Society of Forensic Toxicologists Inc. Publication. 4th quarter 2005, Vol. 29 No. 4

Fitzgerald, Edward. *Intoxication Test Evidence.* 2nd Ed. 2006. (Contributor for Chpt. 36)

*Intoxilyzer 8000 Validation Study.* For the Phoenix Crime Lab.  May, 2005.

**Professional Affiliations:**

California Association of Toxicologists. (CAT)

International Association for Chemical Testing. (IACT)

**Courtroom Testimony:**

Provided expert testimony in forensic toxicology, blood and breath alcohol over 600 times throughout Arizona. Testimony for both the prosecution and the defense.

03/25/2008  15:55    2156376328              LYNN N MELISSA                    PAGE  01/01



# University Services®

*Toxicology Services Group*

Established 1967

**www.uservices.com**

September 17, 2007

Union Pacific Railroad
Ms. Penny Lyons
1400 Douglas Street – STOP 0350
Omaha, NE  68179

RE:  Robert Bradford Jr.
 xxx-xx-9446

Dear Ms. Lyons:

At the request of Union Pacific, we have reviewed chain of custody numbers 54111478 and 53335854.  For reference, chain of custody number 54111478 was collected on 9-4-07 at 5:10 a.m. and was verified positive for amphetamine and chain of custody number 53335854 was collected on 9-4-07 at 3:51 p.m. and was negative.

It is scientifically possible for a specimen to be positive on a test early in the day and negative later in the day.  We continue to rely on the laboratory's reports.

Sincerely,

Benjamin Gerson, MD
Medical Review Officer

Cc:  Union Pacific – Dr. John T. Kelly

10551 Decatur Road • Suite 200 • Philadelphia, PA 19154

EXHIBIT J